UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| BRIAN CASTLE, | ) |
| | ) |
| Plaintiff, | ) 2:19-CV-00092-DCLC |
| | ) |
| vs. | ) |
| | ) |
| KINGSPORT PUBLISHING CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Defendant Kingsport Publishing Corporation (Defendant) has filed a Motion for Summary Judgment [Doc. 54]. Plaintiff has responded [Doc. 66]. Plaintiff Brian Castle also filed a Motion for Partial Summary Judgment [Doc. 56], which Defendant opposed [Doc. 65]. Both motions address the same issue: whether Defendant's use of Plaintiff's Photograph violated Section 501 of the Copyright Act, 17 U.S.C. § 101 *et seq.* The matter is now ripe for adjudication.

**I.  FACTUAL BACKGROUND**

The facts in this case are largely undisputed. In 2018, Sullivan County, Tennessee decided to build a new high school, which turned out to be an unpopular decision at the time. [Doc. 66-1, ¶ 22-23]. After construction began, a public debate ensued over whether they were constructing the school over sinkholes [Doc. 66-1, ¶ 24-25]. It became a "hot topic" with the Sullivan County Board of Education and in the community as a whole [Doc. 66-1, ¶ 28]. Numerous social media postings addressed the topic but because "no one could confirm them," Plaintiff set out to prove their existence with his drone [Doc. 66-1, ¶ 27]. Believing the

1

community should have "information about the construction site," he flew his drone over the site in July 2018, and took "a drone image," which became the Photograph at issue in this case [Doc. 66-1, ¶¶ 32- 33]. Plaintiff added the yellow descriptive text into the Photograph [Doc. 66-1, ¶ 43]. Plaintiff believed his Photograph proved they were building the high school over sinkholes [Doc. 66-1, ¶ 31].

On August 1, 2018, the Sullivan County Board of Education called a meeting to discuss the issue of "potential sinkholes at the West Ridge High School construction site." [Doc. 66-1, ¶ 44]. Before the meeting, Plaintiff had the Photograph enlarged to 2 ft. x 5 ft. and gave it to school board member Mark Ireson so that he could use it at the meeting [Doc. 66-1, ¶ 44-48]. The meeting was a "completely packed house" with people overflowing "out in the parking lot." [Doc. 66-1, ¶ 46]. Plaintiff attended the meeting and distributed about 10 copies of the Photograph, which circulated in the crowd [Doc. 66-1, ¶ 50]. He was not, however, identified as the source or creator of the handouts, and they did not contain any copyright notices. [Doc. 66-1, ¶ 53, 64].

At the meeting, board member Ireson displayed Plaintiff's enlarged Photograph as evidence of possible sinkholes at the site [Doc. 66-1, ¶ 59]. And while many believed the Photograph showed evidence of the presence of sinkholes, the lead engineer did not [Doc. 66-1, ¶ 58, 60]. The geotechnical engineer for the project, Mr. Alex Merrit, however, explained that the geologic formations in the Photograph were not sinkholes at all but "were a result of blasting operations…." [Doc. 66-1, ¶ 60].

Plaintiff posted the Photograph and the drone footage on his Facebook page after the BOE meeting [Doc. 66-1, ¶¶ 67-67]. There were at least 3,500 views of his drone footage and Photograph on his Facebook page [Doc. 66-1, ¶ 70]. The day after the BOE meeting, on August

2

2, 2018, Plaintiff called a news outlet about licensing his Photograph. But he does not recall which specific news or media outlets he contacted about a license [Doc. 66-1, ¶¶ 76-77]. In any event, he never licensed the Photograph, nor did he make any money from the Photograph [Doc. 66-1, ¶ 78].

On August 8, 2018, Defendant published a news article which republished the Photograph Plaintiff had distributed as a handout at the BOE meeting on August 1, 2018 [Doc. 66-1, ¶ 88]. Defendant was unaware that Plaintiff had created the Photograph prior to using it in their news story [Doc. 66-1, ¶ 89]. Its article was about the public debate over whether geological formations depicted in the Photograph were the result of sinkholes or blasting during the construction of the high school [Doc. 66-1, ¶ 92]. Plaintiff acknowledges that Defendant's use of the Photograph was for "news reporting." [Doc. 66-1, ¶ 90].

Defendant displayed the Photograph at the top of its news article. [Doc. 55-2, pg. 143]. Defendant's article is reprinted here:



Images of "anomalies" Sullivan County school board member Mark Ireson identified as potential sinkholes turned out to be the result of rock blasting, an engineer told the school board Tuesday.

Engineer explains origin of 'sinkholes' on West Ridge High site

BLOUNTVILLE — The purported sinkholes on the site of Sullivan County's future high school turned out to be pits formed by blasting rock, an engineer says.

That's how Alex Merritt on Tuesday night shot down the drone images school board member Mark Ireson introduced last week, images Ireson presented as "anomalies" needing further investigation as possible sinkholes and a reason to delay awarding the construction bid for West Ridge High School.

Merritt, geotechnical engineer of record for the project and Tri-Cities branch manager for GEOServices LLC, told the Board of Education the purported sinkholes are nothing more than blasting pits left from dynamiting rock to level the site of the new school, which is scheduled to open in the fall of 2020. One photo indicated 139 F150 pickups would fit in the anomaly.

One pit was shown in drone photos Ireson shared with the BOE during a called meeting to vote on the West Ridge construction contracts, the same pit also shown in a drone video posted on Facebook. Merritt said that pit and a smaller one were simply the result of blasting.

"That is not a karst-induced sinkhole. That is blasting operations," Merritt told the board after an introduction from architect Dineen West.

She had offered to call Merritt during last Wednesday's called BOE meeting, during which a roomful of mostly school opponents faced the board. However, the BOE approved granting the low bids on the construction contracts totaling almost $59.3 million, including $4.8 million to be paid from fund balance and the rest from bond proceeds.

Merritt said that Ireson's presentation at the called meeting focused on March 2017 information included in a bid packet and that additional investigation of possible sinkholes on the site had been done.

"That further review has been completed," Merritt said.

He said initially five core borings were done on the site, but that after the footprint of the school was moved slightly, 12 new borings in "May or June" of this year were completed.

Ireson said he had asked for the results of the additional investigations, but Director of Schools Evelyn Rafalowski told him it "didn't happen."

After Merritt left, Ireson asked for the details on the second set of borings as well as any potential additional areas of concern the drilling might have revealed. West and Rafalowski said they would supply that information to the board.

4

> After the meeting, West described the March 2017 "anomalies" language in bid documents as boilerplate for any major construction project in sinkhole-prone Northeast Tennessee.
>
> During the BOE meeting, Rafalowski also presented a packet of documents indicating the Tennessee Department of Education had no findings, issues or problems with the way the school system has handled federal money for the past three years.
>
> Ireson had said that auditor Dustin Winstead had told him an investigation of carryover federal funds and possible need for corrective actions would be initiated, but Winstead's boss, Maryanne Durski, wrote a letter dated Monday saying that "no corrective actions were needed" on any federal audits.
>
> "I think it was more of a misunderstanding than anything," Rafalowski said.

[Doc. 55-2, pg. 143-45].

Defendant received about $15.20 from indirect advertisements based on web traffic to the article [Doc. 66-1, ¶ 97]. It has not sold any copies of the Photograph or used it to promote or increase traffic to its website. [Doc. 66-1, ¶ 95, 96]. Plaintiff contends he would have charged Defendant $4,000 to $5,000 to license the Photograph, but readily admits he has never received that kind of money for any of the photographs he has ever created [Doc. 66-1, ¶ 98-99].

Plaintiff sued Defendant under Section 501 of the Copyright Act, claiming that Defendant reproduced without authorization his Photograph which Plaintiff owned and had registered [Doc. 1, pg. 1]. Defendant filed a Motion to Dismiss, asserting a "fair use" affirmative defense to Plaintiff's case [Doc. 26]. The Court denied his motion [Doc. 46] finding that the Court could not adequately address whether Defendant's use constituted "fair use" simply on the pleadings, without more contextual information. Since that denial, Defendant has filed its Motion for Summary Judgment, claiming there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

5

## II.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. 54]

Defendant has filed a Motion for Summary Judgment [Doc. 54], claiming that its use of Plaintiff's Photograph as part of its on-line news story was "fair and impliedly licensed." [Doc. 55, pg. 6]. It claims that Plaintiff "widely, and intentionally, published the photograph at issue here before ever attempting to obtain a fee for it." [*Id.*]. It claims that its news story simply "recount[ed] the debate over what the photograph actually depicted, and displayed the photograph given to the reporter." [*Id.* at pg. 7].

In response, Plaintiff contends that Defendant's use of his Photograph was not "fair use" because Defendant used the Photograph "for the same purpose for which it was created, namely to show an aerial view of the West Ridge High School construction site to determine whether geological sinkholes existed (or not)." [Doc. 66, pg. 7]. Plaintiff claims Defendant did not report "on any political or social controversy that arose because of the very existence of the photograph itself." [Doc. 66, pg. 10]. He argues that the Photograph was not controversial, but it was the subject matter of the photograph that lends itself to controversy. [Doc. 66, pg. 13]. It is this distinction that he claims makes all the difference. As a result, Plaintiff argues Defendant's motion should be denied.

## III.     STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v.*

*Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "come forward with significant probative evidence showing that a genuine issue exists for trial." *McKinley v. Bowlen*, 8 F. App'x 488, 491 (6th Cir. 2001). The nonmoving party "may not rest upon mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmoving party based on the record. *Id*. at 251-252.

## IV.    ANALYSIS

### A.    Introduction

The Copyright Act protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). It provides that "[a]nyone who violates any of the exclusive rights of the copyright owner … is an infringer of the copyright or right of the author…." 17 U.S.C. § 501(a). The owner of a copyright has exclusive rights to reproduce the work and in the case of pictorial works, the owner can display the work publicly. 17 U.S.C. § 106. To state a claim under the Copyright Act, the plaintiff must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 563 (6th Cir. 2020) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991)).

Plaintiff asserts that he has a valid copyright in the Photograph he made and presented to school board member Mark Ireson. Indeed, he did register the Photograph but did not register the same image with his textual and visual additions that he distributed at the BOE meeting,

7

which Defendant ultimately republished [Doc. 55-2, pg. 138; Doc. 55-2, pg. 143]. The focus of Defendant's motion is not so much on whether Plaintiff's copyright is valid but on whether its use in covering the controversy at the BOE meeting constituted "fair use" and not a violation of Plaintiff's exclusive right.

The Copyright Act requires a plaintiff to show the defendant violated at least one of the exclusive rights granted to the copyright holder. 17 U.S.C. § 106. In this case, Plaintiff contends that Defendant violated his right to display the Photograph exclusively by reproducing it on its webpage in the news story it covered regarding the controversy that occurred at the school board meeting on August 2, 2018. Defendant reproduced the Photograph in its news story covering the school board controversy. It contends, however, that it cannot be held liable because its use is covered by the "fair use" doctrine.

### B.     Fair Use Analysis

The rights granted to copyright holders under the Copyright Act are not absolute but are qualified by "limitations on exclusive rights." *Kirtsaeng v. John Wiley & Sons, Inc*., 568 U.S. 519, 523, 133 S.Ct. 1351, 185 L.Ed.2d 392 (2013) (citing 17 U.S.C. §§ 107–22). Fair use is a statutory exception to copyright infringement. *Princeton Univ. Press v. Mich. Document Servs*., 99 F.3d 1381, 1390 fn. 5 (6th Cir. 1996)(finding fair use is an affirmative defense, with the party claiming its application, carrying the burden of proof)**.** The Copyright Act provides that "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. The factors the statute requires the Court to consider include:

>  (1)     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>  (2)     the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. It is a mixed question of law and fact. *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). The statute requires the Court to engage in a "case-by-case determination of whether a particular use is fair." *Id.* at 549. Where the "facts are sufficient to evaluate each of the statutory factors," the Court can decide the fair use issue. *Id.* The Court will now turn to the statutory factors.

### 1. Purpose and Character of the Use

The first statutory factor looks at the "purpose and character" of Defendant's use of Plaintiff's copyrighted work. This includes consideration of "whether the new work is 'transformative,' and whether the use of that work is for commercial or noncommercial purposes." *Balsley v. LFP, Inc.*, 691 F.3d 747, 758 (6th Cir. 2012)(citations and quotations omitted). The Court should look to "whether the new work … adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. If the work is "merely retransmitted in a different medium" or if the secondary use is "the same as the original use," the new work is not transformative. *Balsley*, 691 F.3d at 758 (citing *Kelly v. Arriba Soft Corp.,* 336 F.3d 811, 818-19 (9th Cir. 2003)).

Defendant contends here that it materially transformed the nature and meaning of Plaintiff's Photograph by adding news commentary about the controversy Plaintiff's Photograph generated at the school board meeting. It claims its purpose was to report that the Photograph did not depict what school board member Ireson claimed it depicted. On the other hand, Plaintiff

9

argues Defendant's secondary use was not transformative "because Defendant did not report on any political or social controversy that arose because of the very existence of the photograph itself." [Doc. 66, pg. 10]. He argues, instead, Defendant "merely used the photograph to illustrate a descriptive news story about whether the holes in the ground at the construction site constituted geographic sinkholes or man-made holes." [Doc. 66, pg. 10].

Defendant's use of the Photograph was for news reporting, and Plaintiff does not dispute that [Doc. 66-1, ¶ 90]. The caption under the Photograph provides: "Images of 'anomalies' Sullivan County school board member Mark Ireson identified as potential sinkholes turned out to be the result of rock blasting, an engineer told the school board Tuesday." [Doc. 55-2, pg. 143]. Rather than simply using the Photograph to illustrate a "descriptive news story," Defendant was going to the heart of the controversy with its commentary. School board member Ireson used the 2 ft. x 5 ft. enlarged Photograph to show the members of the BOE, and for that matter, the public, that these anomalies were sinkholes and warranted further investigation. Many believed that the Photograph showed the presence of sinkholes. [Doc. 66-1, ¶ 58]. That generated a significant controversy which would have obviously impacted the continued construction of the new school. Defendant did not merely reprint the Photograph in a different medium with nothing more, and it did not republish the Photograph adopting Plaintiff's view of what it depicted. It presented a contrary view – that of the geotechnical engineer over the construction project. Defendant explained that "[t]he purported sinkholes … turned out to be pits formed by blasting rock, an engineer says. That's how Alex Merritt … *shot down the drone images* … Ireson introduced last week, images Ireson presented as 'anomalies' needing further investigation as possible sinkholes…." [Doc. 55-2, pg. 143](emphasis added). Again, the focus was on a contrary view of the drone images that Ireson was claiming justified further investigation Defendant's use

10

brought new meaning to the Photograph and directly challenged Ireson's and Plaintiff's interpretation of the Photograph.

A secondary use "can be transformative in function or purpose [even] without altering or actually adding to the original work." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) (quotation omitted). Defendant did not alter Plaintiff's Photograph, but its use differed from that of Plaintiff. Plaintiff used the Photograph to show "whether the reported sinkholes actually existed at the proposed location for the new high school." [Doc. 66, pg. 6]. He claims, however, that Defendant "used the Photograph to merely illustrate a news story about the subject matter depicted in the image." [Doc. 66, pg. 13]. But Defendant did not use the Photograph for that purpose at all. Rather, it used it to address issues of public concern generated as a result of Ireson's presentation to the BOE, which included the use of the Photograph to prove his point. It was the Photograph that the engineer rebutted and it was that rebuttal that Defendant's news story was about. *See Philpot v. Media Research Center*, 279 F.Supp.3d 708, 714-15 (E.D.Va. 2018)(finding fair use because, in part, the defendant had used the image to address "issues of public concern").

The preamble to Section 107 specifically identifies "news reporting" as not an infringement of a copyright. But Plaintiff claims this "only applies to news reporting of the copyrighted work itself[] not news reporting about the subject matter depicted in the image." [Doc. 66, pg. 11](citing *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017)). *Barcroft* does not help Plaintiff here. *Barcroft* noted that a display of an image may be transformative "where the use serves to illustrate criticism, commentary, or a news story about that work." *Barcroft Media, Ltd.*, 297 F. Supp. 3d at 352. But that is what Defendant did, reporting on the various criticism *about* what the Photograph depicted. Ireson and

11

Plaintiff claimed the image showed sinkholes, the engineer said blasting pits. Defendant did not use the Photograph as an "illustrative aid" to show the presence of sinkholes.

Under this factor, the Court also considers whether Defendant's use was for commercial purposes. To be sure, Defendant received about $15.20 from indirect advertisements based on the web traffic its website received from views of the article. [Doc. 66-1, ¶ 97]. The significance of commercialism on fair use decreases "the more transformative the work" is. *Campbell*, 510 U.S. at 579. In *Campbell,* the Supreme Court noted that the weight to give commercialism "will vary with the context…." *Id.* at 585. In other words, it is not dispositive. In *Campbell*, the Supreme Court reversed the decision of the lower court because it had given "dispositive weight to the commercial nature" of the work. *Id.* at 584. The Supreme Court held that the "commercial … purpose of a work is only one element of the first factor enquiry into its purpose and character."[1] *Id.* Taking that cue from *Campbell,* on balance, commercialism does not play a significant role in this case. Unlike in *Balsley,* where the defendant made over one-million dollars on the sales of the magazine that contained the pirated photograph, Defendant made less than $20.00. *Balsley*, 691 F.3d at 771.

### 2. **Nature of the Copyrighted Work**

The second factor addresses the "nature of the copyrighted work." 17 U.S.C. § 107(2). "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Under this factor, the Court considers

---

[1] As the Supreme Court in *Campbell* noted, "[i]f, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, … since these activities are generally conducted for profit in this country." *Id.* at 584 (quotations and citations omitted).

whether the work was (1) "factual or creative" and (2) published or unpublished. *Balsley*, 691 F.3d at 760; *Cariou v. Prince*, 714 F.3d 694, 709-10 (2d Cir. 2013). "Fair use of expressive or creative works is more difficult to establish than fair use of factual or informational works, and the fair use defense is narrower when applied to unpublished works than when applied to published works." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 382 F. Supp. 3d 312, 327 (S.D.N.Y. 2019)(citing *Cariou*, 714 F.3d at 709-10). As with the first factor, the significance of the second factor diminishes where the secondary work is transformative. *Id.*

The Photograph is a drone image of a construction site. Plaintiff's purpose in taking it was to show the existence of sinkholes. Plaintiff admits that the Photograph is not a product of artistic choice and expression [Doc. 66-1, ¶¶ 36-42]. He admits that "anyone [] could have taken drone shots of the construction site [Doc. 57, pg. 14]. His claim to creativity here relates to his skill operating the drone [Doc. 66, pg. 13]. Even though Plaintiff diminishes his role in taking the Photograph, photographs can be creative and worthy of protection even if from a drone. Photograph images can be creative. In this context, however, the Photograph was intended to convey information and not the result of creative expression.

The Court also looks to see if the Photograph had been published. Plaintiff had previously published it at the BOE meeting, in handouts he distributed at the meeting, and on his Facebook page. While this favors a finding of fair use, this factor "rarely play[s] a significant role in the determination of a fair use dispute." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015).

### 3. Amount and Substantiality of the Portion Used

The third factor addresses "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). "[T]he extent of permissible copying

13

varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. The focus here is on whether the copying is "reasonable in relation to the purpose of the copying." *Id.* at 586. In this case, Defendant used the entirety of the Photograph. Plaintiff contends Defendant's copying was "more than what was necessary to effectuate its purpose." [Doc. 66, pg. 14]. But he does not explain why. Plaintiff's enlarged Photograph was used at the BOE meeting as evidence that the construction site was ridden with sinkholes. Defendant's article reported on the view held by the lead engineer, which contradicted the view Ireson had at the BOE meeting. In this context, Defendant's copying the Photograph in its entirety was reasonable and consistent with its purpose of providing another explanation for the anomalies shown in the Photograph. That Defendant used the entire Photograph "does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006). That is the case here.

### 4. Effect of the Use Upon the Market for or Value of the Original

The final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164. "[W]hen … the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred." *Campbell,* 510 U.S. at 591. "The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original." *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 145

(2d Cir. 1998)(citing *Campbell*, 510 U.S. at 591). There exists a "close linkage between the first and fourth factors, in that the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." *Authors Guild v. Google, Inc*., 804 F.3d 202, 223 (2d Cir. 2015).

Plaintiff argues that Defendant's copying of the Photograph supplanted the market in which Plaintiff had a reasonable expectation to earn licensing revenue. Plaintiff has not shown there is even a potential market for a drone image of a high school construction site in Sullivan County, Tennessee that attempts to show the existence of potential sinkholes [Doc. 66-1, ¶¶ 73-79]. It is undisputed that he has not earned anything from the Photograph, and the one outlet he contacted in an attempt to license the Photograph was not interested [*Id.*]. Moreover, the purpose to which Defendant used the Photograph differed than that of Plaintiff, reducing the likelihood that it would be a satisfactory substitute for the original. *Authors Guild*, 804 F.3d at 223. Defendant has not usurped the market for Plaintiff's work. To be sure, Defendant's use was commercial but only to the extent reporting on the news is commercial. Defendant only generated $15.20 from indirect ad revenue from its webpage. Thus, it seems obvious that Defendant's use of Plaintiff's Photograph did not have a "substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590.

On balance, Defendant's use of Plaintiff's Photograph provided a benefit to the community as it used the Photograph in a story about a topic of public concern. Its use was transformative because it provided a different interpretation of the Photograph than Plaintiff's purpose, which was to show the existence of sinkholes at the construction site. The Photograph was informative and had already been published when Defendant republished it. That Defendant used the Photograph in its entirety does not weigh against it in this context. Finally, Defendant's

use did not have any adverse effect on the market for Plaintiff's Photograph. In consideration of these statutory factors, the Court holds that as a matter of law Defendant's use of Plaintiff's Photograph was fair.[2]

## V. CONCLUSION

For the above reasons, the Court **GRANTS** Defendant's motion for summary judgment [Doc. 54]. The Court **DENIES** Plaintiff's motion for partial summary judgment [Doc.56]. The Court **DISMISSES** Plaintiff's copyright claim with prejudice. The Clerk is directed to close the case. A separate judgment shall enter.

SO ORDERED.

s/Clifton L. Corker
United States District Judge

---

[2] The Court finds it unnecessary to address Defendant's arguments that Plaintiff had impliedly licensed the Photograph to them based on his distribution of the Photograph at the BOE meeting.